WILLIAM MORAN, Executor, v. WILLIAM D. MORAN,
*et al.*, Appellants.

**Wills:** TRUSTS: *Evidence.* Parol evidence is inadmissible to show that, in making an absolute devise, the testator intended that the devisee should hold the property in trust for others, under Code, 1873, section 2326, requiring wills to be in writing; and this is so though the devisee acknowledges the trust in writing and defines its extent.

CHARITIES: *Certainty.* A bequest of money "to be divided among the Sisters of Charity," without any limitation as to locality, state or nation, and without any provision for the exercise of discretion by the trustees, is void for uncertainty.

CERTAINTY: A bequest for a known and lawful purpose, where the power of execution is prescribed and available, should never fail for want of name or a legal classification, unless it is in obedience to a positive rule of law.

RULE APPLIED. A bequest to the pastor of a specific church, "that masses be said for me," although not a charity, creates a valid private trust.

*Appeal from Dallas District Court.*—HON. J. H. APPLEGATE, Judge.

SATURDAY, DECEMBER 18, 1897.

THIS is a proceeding asking for the construction of the will of John Moran, deceased. The will is in the following language, so far as it is important for the purpose of this proceeding: "Will of John Moran. Before these present, I will and bequeath to Patrick Moran five hundred dollars of money. I will and bequeath to William Toomey nine hundred dollars of money. I will and bequeath to Patrick Doyle three hundred dollars of money. I will and bequeath to the Catholic priest who may be pastor of the Beaver Catholic church, when this will shall be executed, three hundred dollars, that masses may be said for me. I will

and bequeath to my brother William five hundred dollars, and to my brother Michael fifteen hundred dollars, and to my sister, Mary Moran, five hundred dollars, and to be divided among the Sisters of Charity, by William Toomey, William Moran, and Rev. H. V. Malone, five hundred dollars. And I will to William Moran, my nephew, a son of my sister, Mary, my farm." The witnesses to the will are William Moran and William Toomey, both of whom are legatees in the will. The probate of the will was contested on the ground, among others, that the subscribing witnesses were legatees thereunder. The testator died without issue and unmarried. He left surviving him William D. and Michael and Mary Moran, as brothers and sister, who, in the absence of the will would inherit the estate. They are defendants in this proceeding, with others, and each is a legatee under the terms of the will. After the filing of the objections to the probate of the will, William Moran, who was a legatee under, and subscribing witness to, the will, filed his answer to the objections, in which he expressly denied that he had any interest in any devise or legacy provided by the will, and alleged that the devise of the farm to him was in trust, only, for the children of his sister, Bridget Tiernan, which trust was declared by parol by the testator, and by the parol agreement on his part to accept said trust. William Toomey, the other subscribing witness, also filed his written relinquishment of any provisions of the will in his favor, and upon a hearing the will was admitted to probate. The plaintiff, as executor, institutes this proceeding, with all parties in interest as defendants, and asks the court to determine what provisions of the will are valid and should be executed. Defendant William D. Moran answers the petition, representing that the bequest of three hundred dollars, that masses might be said, and also of five hundred dollars, to be divided among the sisters of charity, are void, and also that the

devise of the farm to William Moran cannot be established and treated as a trust in favor of the children of Bridget Tiernan, but that, because of the relinquishment by William Moran, the same becomes a part of the estate, for distribution among the heirs at law as if the said john Moran had died intestate. Other pleadings were filed, by other parties, presenting their respective claims for construction in accord with their interests. The district court adjudged the bequests for masses and to the Sisters of Charity valid, and that the devise to William Moran, of the farm, was in trust for the children of Bridget Tiernan. The defendant [William D. Moran appealed.—*Modified and affirmed.*

*Bobt. S. Barr* and *Shortley & Harpel* for appellant.

*White & Clarke* for appellees.

GRANGER, J.—I. We first notice the question whether or not what appears by the terms of the will to be an absolute devise to William Moran of the farm can be shown by parol evidence to be in trust for the children of Bridget Tiernan. It appears that the will was drawn by Father Malone, a Catholic priest. There were present, other than the priest and the testator, William Moran and William Toomey, who were subscribing witnesses. The situation will be best seen by quoting from the record a little of the evidence. Father Malone testified: "When I sat down, I told him now we were ready to write anything he wanted us to write; and he says to me, the very first thing, 'I want Billy, here, to take that farm, and give the benefit to those children.' I says, 'What children do you mean?' and he says, 'The Tiernan children.' We didn't understand how he wanted the title fixed,—whether he wanted it left to the Tiernan children by will, or leave it to William in trust. Q.

What was said by him? What did he say in reference to that? A. I stopped and hesitated quite a bit, because I didn't want to disturb the man any more than was necessary. I remember I said: 'John, you don't fix the title to that property, and, if we write it down the way you say it would be very vague. Can't you make it clearer?' He says: 'Billy can explain it to you, if you want it.' And it seemed to worry him when I said that. I says : 'Let us drop that out until we write the rest, and leave that to the last.' When we had writen the other items, I says: 'I believe we have written all but that.' He says: 'I want it left to Billy, simply.' I wrote it down, and says: 'Is that what you want?' He says: 'Yes, sir; that is it exactly. Billy will know what to do with the children.' In order to get more information without questioning, I says: 'That is a very good idea. Some of the children are very young, and they might squander it.' He says: 'That is it, exactly. Some of them might not be as good as they might be, and, if they got any part of this property, they might squander it; and, in order to prevent it, I want him to have that title, so that he can discriminate among them as he sees fit.' And then he made the remark that it would prevent litigation and keep it out of court." William Moran, the devisee, testified as follows: "He said he wanted to leave it to these children, for their use and benefit, and he wanted to put it in my name, so there would be no costs or court expense. For that reason it was put as it was." "I asked him if he had any particular choice, that he should leave more to one than to others. He said, 'No;' if they were all good, he wanted them to get equal amounts, and, if there was any poor ones (that is, ones of bad character), he didn't want them to have anything. I consented I would carry out his instructions if I was permitted to do so."

While there is a claim otherwise, we think it clearly appears, by parol evidence, that the testator's intention was to devise the farm to Moran, only for the use and benefit of the Tiernan children. With this expression of opinion as to the sufficiency of the evidence if admissible, we may better consider the legal proposition whether, under the provisions of our statute, such evidence is competent to show the fact. It will be remembered that the devise is absolute to Moran of the farm, in the following language: "I will to William Moran, my nephew, son of my sister, Mary, my farm." Can the devise so made, by evidence like the above, be so affected, changed, or modified as to give it the effect of a devise in trust to Moran for the use and benefit of said children? Upon this question the parties are in very earnest contention; appellant saying it cannot, because of the following provision of the Code of 1873, in force at the time of the execution of the will, and of the trial of the case in the district court.

"Sec. 1934. Declarations, or creations of trusts or powers, in relation to real estate, must be executed in the same manner as deeds of conveyance; but this provision does not apply to trusts resulting from the operation or construction of law."

"Sec. 2326. All  *  *  *  will, to be valid, must be in writing, witnessed by two competent witnesses and signed by the testator, or by some person in his presence, and by his express direction."

Reliance is also placed on the statute of frauds.

Appellees maintain that the devise can be so affected, and state two propositions, either of which is said to be sufficient to support the conclusion,—first, that "the case is not within the statute of frauds or of wills," and "that it has been held universally, in such cases as the one at bar, that the statutes are inapplicable and are not to be invoked to accomplish a

fraud." A little sifting out of claims that we are dis-
posed to disregard, will tend to simplify the disposition
of the question. The statute of frauds seems, by its
express language, to prescribe a rule of evidence
applicable to contracts; and, without any holding on
the question, we may say that it is a matter of serious
doubt if it was ever intended to apply to testamentary
dispositions of real estate. Section 1934 of the Code of
1873, providing that "declarations or creations of
trusts or powers in relation to real estate must be exe-
cuted in the same manner as deeds of conveyance," is a
section of a chapter on real estate, the purport of which
seems to be as to transactions other than those of a
testementary nature; and, without placing any con-
struction on the scope of either of those statutory pro-
visions, they may be understood as in no way influenc-
ing our conclusion on this question. The statu-
tory law that we do regard as applicable and
controlling is that "Of Wills and Letters of
Administration," wherein it is provided who may dis-
pose of his property by will, and how it shall be done.
After specifying the circumstances under which per-
sonal property may be disposed of by verbal will is
the provision we have quoted above, that "all other
wills, to be valid, must be in writing, witnessed by two
competent witnesses and signed by the testator, or by
some person in his presence, and by his express direc-
tion." This provision as to wills being in writing is a
general, if not a universal, statutory requirement in this
country; and hence judicial determinations and general
rules of construction may prove valuable aids to a
conclusion. Looking at the question solely in the light
of our statutory language, if we permit the evidence in
this case to ingraft on the will the modification sought,
the effect will be to change the absolute devise to Wil-
liam Moran of the farm into a devise as follows: *"I
will to William Morgan  *   *   *   my farm, in trust*

*for the children of Bridget Tiernan."* The provision
established by oral evidence, and without which it
could not be even thought of, entirely destroys the
devise manifest from the language of the will, and
makes another. Can such a devise properly be said to
be in writing? From an extended examination of
authorities, we are led to regard the rule as universal
that the plain effect of the language as used in the
will is not to be varied by external proof of what effect
was really intended. Parol evidence may, indeed, be
resorted to for the purpose of making intelligible in the
will that which cannot without its aid be understood, or
resolving a doubtful interpretation; but if the language
of the will, in point of legal construction, requires one
interpretation, and can be understood in that sense, evi-
dence of intention cannot be adduced to give it another
and different interpretation. Such is the rule as stated
in Schouler, Wills, section 587. Mr. Redfield, in his
work on Law of Wills (volume 3, page 59), in a connec-
tion to make the language entirely applicable, uses this
language: "The very purpose of requiring wills to be
in writing would be wholly defeated if courts of equity
were allowed to ingraft upon their provisions such parol
trusts as seemed probably to have existed in the mind
of the testator." It is to be said that such a rule has
general support in authority, but we are cited to a
larger number of cases said to sustain the rule of appel-
lee's contention. We cannot agree with appellees in the
claim that they apply to the facts of this case. That there
are authorities to the effect that where a testator,
because of the fraud of a devisee, is induced to make the
devise on the representation by the devisee that he will
take the devise in trust for another, who was the real
object of his bounty, equity will enforce the trust, is not
to be questioned. See *Hooker v. Axford*, 33 Mich. 454;
*Hoge v. Hoge*, 1 Watts, 216; *Dowd v. Tucker*, 41 Conn.

197; *Williams v. Vreeland*, 29 N. J. Eq. 417; *Tee v. Ferris;*2 Kay & J. 357. Numerous other cases could be cited, but it is not important to do so. In these cases,—and, if there are exceptions, we have not noticed them,— equity has interfered to enforce a trust on the ground of fraud, in the practice of which the devisee has, by his acts or silence, prevented the testator from, or led him to avoid, making provisions in his will which he intended; and the cases cited were not for the construction of the wills, but to declare a trust based on the fraudulent acts by which the making of the will, as intended, was prevented. The cases do not attempt to change the wills, or to construe them, but to fix obligations because of the acts of the devisee. In this case there is no claim of fraud, nor that the devisee in any way induced the devise. The will was written just as the testator desired it. He wanted Moran to have the title, and he gave it to him. He also wanted Moran to hold and use the property for specified purposes, and neglected to make any provision for it in his will, and that is what the authorities say cannot be ingrafted onto the will by oral proof. If, in this case, we sustain the trust, we must say that the testator intended by his will to create the trust, while we know at its making, and all present knew, that he did not so intend, but he did intend verbally to create the trust. In fact, all was done as he intended to do it, but not in a way to give his intentions effect. Assuming that he knew the law, as we must, he purposely departed from its requirement to make the devise in writing. It is also to be said that the objector, who is a brother of the deceased, and urges the invalidity of the devise, had no part in, and, so far as the record discloses, had no knowledge of, the making of the will. He is in no way in fault that the will does not express the intention shown by the verbal proof. In this respect the case is unlike those in which a trust is sustained. We think the cases all

expressly or impliedly guard the exercise of authority
to maintain or enforce such a trust by the fact that the
testator would have done what the trust is maintained
for, had not fraud prevented it. That is not true of this
case. It is also said by appellees that, if further writing
is necessary to prove the trust, it is found in the answer
of William Moran in the probate proceedings, in which
he acknowledged the trust and defined its extent. Mr.
Moran is to be commended for his unselfish and faith-
ful course in the matter, by declining so generous a
bounty at the expense of a breach of confidence, but he
cannot by his writing do what the testator should have
done. The conditions of the will were fixed by the
expressed intentions of the testator in the way provided
by law. Inasmuch as William Moran has relinquished
all claims under the will, except such as should come
from the trust sought to be shown, and as no trust can
be sustained, the devise of the farm must fail; and it
becomes a part of the residuary estate, to be disposed
of as if no devise of it had been attempted.

II. Objection is made to the provision of the will
in favor of the Sisters of Charity, which is in these
words: " I will and bequeath, * * * to be divided
among the Sisters of Charity by William Toomey, Wil-
liam Moran, and Rev. H. V. Malone, five hundred dol-
lars." It is said that the bequest is void because
of uncertainty, and we think the objection must
be sustained. We do not question the rule that
it is competent for a testator to bestow a charity on a
person or institution to be chosen by a trustee or
executor, and that such bequests will be upheld. It is a
historical fact, of which we may take notice, that Sisters
of Charity are general throughout the state and country.
It appears in evidence that they constitute a charitable
sisterhood of the Catholic church. The provision of
the will is that the bequest is to be "divided among the
Sisters of Charity." If the bequest should be sustained,

how would the trustees execute it? No one would say
-that it should be divided among all of them, for such,
in reason, could not have been the intention. There is
no limitation as to locality, state or nation. We infer
that appellees think the trustees may select to whom
the bequest shall be given. The will does not so pro-
vide. In *Lepage v. McNamara*, 5 Iowa, 124, with a very
similar question under consideration, as to the legal
proposition it is said: "If there is such uncertainty as
that it cannot be known who is to take as beneficiary,
the trust is void; and the heirs, by operation of law,
will take the estate, stripped of the trust." That rule
is decisive of the question. There is no attempt in
argument to say who the beneficiary of this bequest is,
in language less uncertain than the will itself. There
is no contention that the will is sufficiently specific, if
the trustees may not use a discretion, and no such right
is granted. The bequest is void for uncertainty.

III.   It is also urged that the provision of the
will, in order that masses might be said for him, is
void. The bequest is as follows: "I will and bequeath
to the Catholic priest who may be pastor of
Beaver Catholic Church, when this will shall be
executed three hundred dollars, that masses may
be said for me." The testator was a member of Beaver
Catholic Church. It had a definite and known location.
It is not to be doubted that the words of the bequest
"when this will shall be executed" mean when the will
should be carried into effect. An objection to the
bequest is that it contained no element of a charitable
use. That is true, but bequests are not limited to such
purposes. We must assume that the bequest was
inspired by his religious convictions as to duty in the
way of furthering his hopes and purposes for security
and happiness hereafter. Promises and pledges made
in life for the support of religious observances to the
same end are usual, and supported by undoubted

authority.   Why is not a bequest to secure such observ-
ance after one's death, for the same purposes, valid?
It is said that "the soul of the deceased being a use not
recognized in law, and the donor and use being the
same, and not in life, the bequest should be held void." It
is thought that *Russell v. Allen*, 107 U. S. 163 (2 Sup. Ct.
Rep. 327), sustains appellant's view, but a careful exam-
ination of the case shows otherwise.   The case has to do
with charitable bequests, and where they are void,
because the object of the charity is not so defined as
that it may be known.   We have in this case recognized
the rule of that case in the respect stated; but, as we
have said, this bequest is not a charity.   It is an expendi-
ture directed by the testator for a service promised to
him, and the fact that, when the service is to be
rendered, he will not be living, so as to be a beneficiary
in this life, is a matter of no concern to the courts.   His
soul's welfare in the hereafter is a matter of his per-
sonal concern, for which, when not contravening public
policy, he may act as his judgment and beliefs shall
direct.   It is not the province of the courts to inquire
as to the soundness or reasonableness of religious
beliefs, but to respect all such, and the ceremonies of
their observance, wherein they do not militate against
the public peace and security.   The provision is little
different from one for the erection of a monument after
his death, or the doing of any other act that he might
desire, not intended for the benefit of any one living,
but which, if living, he might lawfully do.   Such
bequests, if made so definitely as that the intent may
be known and carried into effect, are valid.   In a some-
what recent case in Alabama [*Festorazzi v. St. Joseph's
Catholic Church*, 104 Ala. 327 (18 South. Rep. 394)], the
legal effect of such a bequest is considered.   The bequest
there considered was in these words: "I give and
bequeath to the Roman Catholic Church of St. Joseph,
in the city of Mobile, the sum of two thousand dollars,

to be used in solemn mass for the repose of my soul."
The case treats the bequest as a private trust, which,
we think, is the proper class in which to place such a
bequest. In holding the bequest invalid as such a trust,
it is said: "It is not valid as a private trust, for the
want of a living beneficiary. A trust in form, with no
one to enjoy or enforce the use, is no trust." The latter
proposition is not to be doubted. The former we need
not consider, for that branch of the case is made to turn
on the fact that "there is no imaginable being possess-
ing power to enforce the use declared in the bequest."
The statement as to such a bequest being void for want
of a living beneficiary is not argued. It will be noticed
that in that bequest the trustee is the church, because of
which it is said there is no imaginable person to enforce
the trust. That is not true of this case. The priest of
the church designated, at a specified time, is made the
person to execute the trust; and, when he accepts the
money he becomes repsonsible to the court for the
proper discharge of his duties as trustee.

The cases on this subject are not in accord. Some
of the courts have been slow to get away from the rule
of the English cases in which, under their amalgamated
condition of church and state, such bequests and
devises were held void, as superstitious uses or creating
perpetuities. In *Festorazzi v. St. Joseph's Catholic
Church, supra*, it is said: "Under our political institu-
tions, which maintained and enforced absolute separa-
tion of church and state, and the utmost freedom of
religious thought and action, there is no place for the
English doctrine of superstitious uses." Similar
language has been repeatedly used by the courts if this
country. In *Gilman v. McArdle*, 99 N. Y. 451 (2 N. E.
Rep. 464), the question was to the effect of an agree-
ment by which money was accepted during the lifetime
of the decedent, to be applied to certain purposes, and
the residue to be expended for Roman Catholic masses,

to be said for the repose of her soul, and that of her husband. The court declined to definitely settle the question as to the application of the residue, for masses, but the opinion contains a discussion of bequests for such purposes, incidental to other questions, that is worthy of notice. The lower court in that case had held that, as to the surplus to be used for masses, it was held by one as mere agent, whose authority was revocable, and that no valid trust had been created; that there was nothing illegal or contrary to public policy in the purpose to which the money was intended to be applied, but that, as a trust, it was void for want of a beneficiary who could enforce it, both of the persons for whose benefit the masses were to be solemnized being dead. The same court expressed the opinion that the disposition of such surplus would have created a valid trust if contained in a will. This holding and language of the court is made the basis on which the court of appeals based its discussion and conclusion. The argument is clear to the effect that there is no such distinction in law as that an agreement during life, for the expenditure of money for masses after death, is invalid, but that a testamentary provision to that effect would be valid. The two methods are unmistakably made of equal validity, for the court, after specifying the facts, says: "Such a contract could be enforced by the legal representatives of the promisee, and, in case of a refusal to perform, they could recover the consideration paid. It certainly must be in the power of a person to provide, either by will or contract, for matters of this description, and I can see no legal reason why he should be confined to a testamentary direction." This conclusion follows some argumentative language that gives to it an added value, and we quote it as follows: "But in the case before us, even if it should be conceded that the agreement under which the defendant received the money could not be sustained strictly as a trust, on the

ground of the want of a beneficiary to enforce it, it would not follow that it was of no effect whatever. As a trust, the same objection, if valid, existed to the undertaking to apply the fund to defraying the funeral expenses of the deceased and her husband, and to the erection of a monument to their memories, but it would be a great abridgement of the rights of property to deny to any person the power, in his lifetime, to enter into a contract to be performed after his death by another person, to do or procure to be done any act not objectionable as against any rule of law, morals, or public policy, and to pay the consideration for the performance of such a contract. It appears in this case that the defendant was an undertaker; that the deceased selected the kind of a coffin she desired, and described the monument she wished erected, and specified the times at which the masses were to be solemnized; and the finding of the court is that the defendant received the money on the terms stated by the deceased, and promised to apply it to the uses and purposes therein mentioned. There was no indefiniteness about this contract, and it was easy of performance. There certainly can be no legal objection to a person contracting in his lifetime for his funeral, his coffin and his monument, and even for the solemnization of masses, and paying for them in advance. And, if so, what reason can there be for denying him the power of paying a sum of money to a third person on his agreement to procure those things? Suppose a person should desire in his lifetime to provide for the writing of his biography, the publication of his literary works, the painting of his portrait, or the erection of a statute to his memory after his death? He certainly can make a valid contract with any person to do either of those things, and pay for them; and although they may be personal to himself, and for the gratification of his own feelings and perhaps his vanity, and he cannot, in strictness, create a

trust for the purpose, because there will be no bene-
ficiary, as he will not live to enforce it, why should he
not be at liberty in his lifetime to contract with some
person of his confidence to procure them to be done,
and, as a consideration for such agreement, to pay him
the sum necessary to defray the expense?" We may
assume that if such an agreement has the sanction of
the law, because it has the elements of a valid con-
tract, so would a testamentary provision with precisely
the same elements for its support. It is not wise, in
such cases, for courts to quibble about technical
trusts or beneficiaries. Results are of greater
importance than technical names, and a bequest for
a know lawful purpose, where the power of execution
is prescribed and available, should never fail for want
of a name or a legal classification, unless it is in obedi-
ence to a positive rule of law.

We have said that this bequest, if the priest should
accept the money, is a private trust; and we think it
possesses the essential elements of such a trust, as much
as it would if the object were the erection of a
monument or the doing of any other act intended
alone to perpetuate the memory or name of the
testator. But even if there is a technical departure,
because of no living beneficiary, still the bequest is
valid. We have also said that it is not a charity, and
we can discover no element of a charity in it. It seems to
be a matter entirely personal to the testator. In one
or more cases the courts have felt the necessity, in order
to sustain such a bequest, to denominate it a "charity,"
because charitable bequests have had the sanction of
the law. We know of no such limitation on testa-
mentary acts as that bequests or devises must be in the
line of other such acts, if otherwise lawful. Such a
bequest has direct support in *Seibert's Appeal* (Penn.),
18 Wkly. Notes Cas. 276. *In re Schouler*, 134 Mass.
426, such a bequest is sustained, and it is said: "Masse.

are religious ceremonies or observances of the church, * * * and come within the religious or pious uses which are upheld as public charities." Our conclusion is that, as to the devise of the farm and the bequest to . the Sisters of Charity, the will must be held inoperative, and the property passes to the residuary estate. As to the bequest for the saying of masses for the testator, the will is sustained. The judgment will stand MODI-FIED AND AFFIRMED.